**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00208-CV**
_____

**KAITLYN E. OLIVER, Appellant**

**V.**

**PHILIP DAVID OLIVER, Appellee**

_____

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-07-08677-CV**

_____

**MEMORANDUM OPINION**

Appellant Kaitlyn E. Oliver ("Kaitlyn") appeals from the trial court's Final Decree of Divorce. Kaitlyn argues the trial court erred in finding she committed adultery and in failing to find her ex-husband Philip David Oliver ("David") also committed adultery. Kaitlyn also argues the trial court erred in its division of property.

1

Kaitlyn and David were married on October 18, 2014. The couple ceased to live together in April 2017. David filed an original petition for divorce and Kaitlyn filed a counterpetition, and both parties subsequently filed amended pleadings. In their original pleadings, both David and Kaitlyn alleged that the marriage was insupportable as grounds for divorce. In the amended pleadings that were the live pleadings at the time of trial, both David and Kaitlyn alleged the marriage was insupportable and that the other party had committed adultery as grounds for divorce. The matter was tried to the bench in March 2018. The trial court granted the divorce "on the grounds of insupportability and adultery by Kaitlyn" and ordered the following division of property:

- David was awarded the marital residence at 1912 Foxtail Place, funds in a Capital One bank account, an IRA E*Trade account, a Dynamic Risk 401(k) account other than $55,792.82 awarded to Kaitlyn, and all personal property in his possession.

- Kaitlyn was awarded funds in two Capital One bank accounts (different from the account awarded to David), a BOK Financial account, $55,792.82 to be paid from the Dynamic Risk 401(k), a 2015 Jeep Grand Cherokee, and all personal property in her possession.

- David was ordered to pay the balance of $152,000 on the promissory note on 1912 Foxtail Place, debts on two bank accounts, and any debts incurred solely by him since April 18, 2017.

2

- Kaitlyn was ordered to pay the promissory note on the Jeep Grand Cherokee, the debt on a bank account, and any debts incurred solely by her since April 18, 2017.

- The following property was decreed as David's separate property: a Subaru, $29,584.30 from the Dynamic Risk 401(k), his wedding ring, and "$37,680.00 of separate property interest claim" in the marital home at 1912 Foxtail Place.

- The following property was decreed as Kaitlyn's separate property: two Capital One bank accounts, $4,908 in her BOK Financial 401(k) account, her wedding and engagement rings, and "$28,560.00 of separate property interest claim" in the marital home at 1912 Foxtail Place.

- Each party was ordered to be responsible for his or her own attorney's fees.

Kaitlyn appealed.

David's Testimony and Evidence

David testified that the marriage came to an end because he and Kaitlyn were no longer compatible. According to David, the couple separated in April 2017 and Kaitlyn "voluntarily moved out of the house[]" at that time, and they decided to divorce in May. David testified that he believed Kaitlyn committed adultery before they agreed to the divorce. He further testified that he found out who Kaitlyn was dating when that man helped her move items out of the house. According to David, because he was aware Kaitlyn was dating someone else, he thought it would be okay if he also dated other people. David testified that he had been dating a woman since

3

the summer before trial, and he agreed that he had committed adultery "[p]ost-divorce, mutual divorce agreement between us two[.]"

David testified that he and Kaitlyn bought the house at 1912 Foxtail Place ("the Foxtail house") together from Kaitlyn's grandmother's estate and the purchase price was below the appraised value of the house. According to David, Kaitlyn's grandmother died on October 11, 2014, about a week before he and Kaitlyn got married, and the grandmother "transferred" the house to Kaitlyn's mother and uncle. David testified that he and Kaitlyn paid $160,000 for the Foxtail house, which appraised at $210,000 at the time of purchase. A copy of the sales contract was admitted into evidence, showing a sales price of $160,000. David explained that one reason the sales price was so much lower than the appraised value could have been due to extensive termite damage or because the discounted price was a gift to him and Kaitlyn as a couple. According to David, there was "nothing in writing to indicate that there was some sort of separate gift to Katie."

He further testified that the warranty deed was issued in both their names, that the mortgage was in both names, and that the deed listed Kaitlyn's mother and uncle as the sellers. David testified that the deposit of $8,400 on the purchase of the Foxtail house was made from his personal account. He also testified that he paid $2,800 for a fence at the house in October 2014.

4

David testified that he understood Kaitlyn was completely moving out of the Foxtail house, that he and Kaitlyn had talked about the house, and that he understood they had agreed that David would continue to live in the house and would pay Kaitlyn "whatever amount we deemed fair to stay in the house." David was surprised that Kaitlyn wanted to return to the house, and he testified that he did not believe there was any documentation to back up Kaitlyn's $60,000 separate property claim on the house.

David testified that he put in "countless hours" remodeling the Foxtail house and making improvements:

> I helped renovate the kitchen and laundry room. I tiled the floor in the kitchen and laundry room. I tiled the backsplash. Installed the garbage disposal. Installed a new dishwasher, microwave oven. I have wired lights in the kitchen. I have retextured and painted the walls in the kitchen. I tiled the backsplash in the laundry room. I replaced the water heater myself in the laundry room. I have -- I remodeled the master bathroom in [] the master bedroom. I tore out the old shower and had to repair extensive termite damage in the corner of the house, and I tiled the master shower and installed a door. Installed two toilets in the house. I have recently repainted the hall bathroom and replaced all the hardware in that bathroom and installed the new light fixture. I have hung a ceiling fan in the master bedroom. I sodded the back yard. I have maintained all the outside of the house. Installed the new garage door and installed two new windows in the house.

> . . .

> [Since Kaitlyn moved out,] I painted the hall bathroom. I put all new hardware in that bathroom, and I hung a new light fixture. I have -- I had to replace the garage door, and then I replaced two windows in the

5

> formal living room and I -- I have also painted a few other things, touching up and patching holes in walls.
>
> . . .
>
> . . . The garage door broke, and I had to have it replaced and that was about $725. And I -- recently a couple windows got broken in the formal living room. Dog jumped on a chair, fell into the window, and it broke. So I had to replace those. That was $684. And I have done other improvements, such as I planted the flowerbed in the back yard and spent around $200 on plants with that. And I also -- I kind of renovated the hall bathroom and bought supplies to paint, and I changed out the hardware and changed out the lighting fixture which, all told, that was around $200 as well.

According to David, he paid for the repairs to the house from his "personal account." David testified that the taxes on the Foxtail house had been paid but that Kaitlyn had not paid any of the taxes. David also testified that, since Kaitlyn had moved out, he had paid 100% of the mortgage payments, for a total of about $13,000, and he asked the court for reimbursement for those payments.

An October 2014 appraisal of the property was admitted into evidence, reflecting the house had an appraised value of $210,000. Another appraisal of the property dated September 2017 was also admitted into evidence, reflecting a value for the house of $240,000. A document titled "Itemization of Amount Financed" dated October 22, 2014, was admitted, reflecting an amount financed of $149,798.92. David testified that he wanted to have the Foxtail house awarded to him and take on all the debt associated with the house. He testified that there was

6

about $100,000 equity in the Foxtail house. According to David, Kaitlyn could be "compensated fairly[]" as to the house with a cash payment.

David testified that there were three retirement accounts: an E*Trade IRA with a balance of about $100, a BOK 401(k) that Kaitlyn had prior to the marriage that had about $5,000, and a Dynamic Risk 401(k) he had prior to and during the marriage. According to David, prior to the marriage, the balance of the Dynamic Risk account was $29,584.30, and he agreed that an additional amount of about $88,000 in the account was community property.

David testified that he bought the house at 3114 Snowbird Meadow Drive prior to his marriage to Kaitlyn. According to David, he was requesting reimbursement of $15,998.37 that represented the proceeds from the sale of that house and testified that he had used the money for improvements to the Foxtail house. David agreed that he was also requesting reimbursement of $15,000 that was an inheritance from his grandmother that he used to renovate the Foxtail house. David's mother also testified that she wrote him a check for $15,000 in November 2014 that was his inheritance from his grandmother.

David testified that at the time of the marriage, he owned a vehicle that was completely paid off and that Kaitlyn owned a Jeep Cherokee, and he agreed that Kaitlyn's claim of reimbursement of $3,000 for the Cherokee was "totally fair."

David agreed that Kaitlyn's Tiffany engagement ring, valued at about $15,000, and her wedding band, valued at "a couple thousand[,]" were her separate property. David testified that he was asking the court to award him his wedding band, which had a purchase price of about $300, as his separate property.

Kaitlyn's Testimony and Evidence

Kaitlyn agreed that she was unfaithful to David with two men. She agreed that one relationship began in 2016, before she moved out of the couple's home. She agreed there were nights that she did not come home. Kaitlyn testified that she became unhappy in the marriage, she felt their relationship was "dependent on the idea that David was very superior" to her, and she believed David was controlling and believed he was "entitled[.]" According to Kaitlyn, at some point during the pendency of the divorce, David changed the locks on the house and did not allow her to enter. Kaitlyn testified that she and David had a discussion wherein they recognized the relationship was not going to continue and they were both comfortable that they could date other people. She agreed she amended her divorce petition to make an adultery claim against David because "he attacked [her] first[.]"

Kaitlyn testified that she wished to continue living in the Foxtail house because "it was definitely a gift" from her mother to her, and it was part of her mother's inheritance that her mother wanted to pass on to Kaitlyn. Kaitlyn did not

8

believe that David would have benefited from the $50,000 discounted price if he was

not marrying her:

> [Counsel for Kaitlyn]: . . . [H]ow close was it from the time your grandmother died to the time your mother got the property to the time that it was given to you?
>
> [Kaitlyn]: It was all within a month-and-a-half. My grandmother passed the week before our wedding, and we closed on the Foxtail home in December. So --
>
> [Counsel for Kaitlyn]: Did your mother make it clear to you that she was selling the house at a deeply discounted rate?
>
> [Kaitlyn]: Definitely.
>
> [Counsel for Kaitlyn]: Did she make it clear to you that this was as a wedding gift?
>
> [Kaitlyn]: It was not a wedding [g]ift, no.
>
> [Counsel for Kaitlyn]: What was it?
>
> [Kaitlyn]: It was a gift to me, to keep it in the family.
>
> [Counsel for Kaitlyn]: So you would put it more like an inheritance?
>
> [Kaitlyn]: I would, and I think all that she could do within her means was gift me $50,000. But that's where David and I came in and agreed to purchase it for 160.

Kaitlyn disagreed that only David had put in time and effort into making upgrades

and additions to the house, and she testified that she painted and made "other

additions" to increase the value of the home. According to Kaitlyn, her mother also

9

continued to give the couple gifts for the house. Kaitlyn agreed that the warranty deed for the house shows that her mother and uncle sold the house to both of them and the deed has no reference to a gift to her.

Kaitlyn testified that at the time of the marriage, she owned a 2006 Mazda that she later sold, and she applied the proceeds to the purchase of another vehicle. She also testified that she had a retirement account before marriage.

Testimony of Susan Hayes

Kaitlyn's mother, Susan Hayes, testified that the Foxtail house had been in her family for many years. Susan testified that although her mother was in hospice care for the last year of her life and not in the home, the family wanted to keep the house in the family and decided not to sell it. According to Susan, she and her mother decided to give the house to Kaitlyn after talking about it "quite a bit." Susan testified that Susan and her brother inherited the house when their mother died. Susan further testified that when the house was transferred over to David and Kaitlyn, "[t]he gift had already been made[]" to Kaitlyn and "[t]he portion that wasn't a gift was then sold to them." When asked why there was nothing written about a gift to Kaitlyn, Susan replied "[t]he gift was before the sale of the house. They are two separate things." Susan agreed that Kaitlyn and David "equally purchased[]" the house. Susan did not remember saying anything to David about her intent for Kaitlyn to have a

10

portion of the house as a gift. Susan testified "David is not my son. Katie is my daughter. Of course[,] the gift was to my daughter. It is not to anybody else." Susan also testified that both David and Kaitlyn got the house at a discounted price. Susan agreed that the proceeds of the sale went to her and her brother and that both Kaitlyn and David were getting the house at a reduced price. Susan recalled that Kaitlyn and David purchased the house about three weeks after they got married.

## Issues

Appellant raises five issues on appeal:

I.  The Trial Court's $37,680 Award to Husband From the Community Property House as Separate Property Reimbursement Was Supported Only by Oral Testimony That Could Not Meet the Required "Clear and Convincing" Standard.

II.  The Trial Court's $37,680 Award to Husband From the Community Property House as "Reimbursement" Was Erroneous Because Husband Failed to Properly Prove Up His Claim Pursuant to Texas Family Code Sec. 3.402.

III.  The Trial Court's Finding That $29,584.30 in Husband's 401(k) Was Separate Property Was Supported Only by Oral Testimony That Could Not Meet the Required "Clear and Convincing" Standard.

IV.  The Trial Court Erred in Finding "Adultery" Only Against Wife When Husband Admitted Committing Multiple Acts of Adultery.

V.  The Trial Court Erred by Awarding Wife's 13.6% Separate Property Interest to Husband in Violation of Texas Constitution Article XVI, Sections 15 & 50.

11

Standard of Review

A trial court is charged with dividing the community estate in a "just and right[]" manner, considering the rights of both parties. Tex. Fam. Code Ann. § 7.001. The party complaining of the trial court's division of property must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion. *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied). Under an abuse of discretion standard, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991). They are not independent grounds of error. *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.); *Crawford v. Hope*, 898 S.W.2d 937, 940 (Tex. App.—Amarillo 1995, writ denied). If there is any reasonable basis for doing so, we must presume that the trial court exercised its discretion properly. *Pletcher*, 9 S.W.3d at 446. We presume that the trial court made all the necessary findings to support its judgment, and if the implied findings are supported by the evidence, we must uphold the judgment on any theory of law applicable to the case. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Garcia v. Garcia*, 170 S.W.3d 644, 652 (Tex. App.—El Paso 2005, no pet.). We will not disturb the trial court's division unless the record demonstrates "that the division was clearly the result of an abuse of

12

discretion." *Pletcher*, 9 S.W.3d at 446. That is, we will not reverse unless the record clearly shows that the trial court was acting arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence and some evidence supports its decision. *See In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).

Applicable Law

Characterization of Property

Property possessed by either spouse during or at the dissolution of the marriage is presumed to be community property, but the presumption may be rebutted by clear and convincing evidence. Tex. Fam. Code Ann. § 3.003; *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975). Any doubt as to the character of property should be resolved in favor of the community estate. *Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.). In the context of a divorce proceeding, characterizing property as separate or community depends on the character of the property when it was acquired and the circumstances of its acquisition. *See Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001); *Rivera v. Hernandez*, 441 S.W.3d 413, 420 (Tex. App.—El Paso 2014, pet. denied). Separate property consists of all the spouse's property, both real and personal, that is owned

13

or claimed before marriage, and that is acquired after marriage by gift, devise, or descent. Tex. Const. art. XVI, § 15; Tex. Fam. Code § 3.001(1), (2). Community property consists of property, other than separate property, acquired by either spouse during marriage. Tex. Fam. Code Ann. § 3.002. The party who asserts that property is his or her separate property bears the burden of proof to establish that property is separate property and must do so by "clear and convincing evidence." *Id*. § 3.003(b). Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. To properly support an assertion that property is separate property, the proponent must introduce documentary evidence sufficient to overcome the community presumption. *See Graves v. Tomlinson*, 329 S.W.3d 128, 140 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (explaining that testimony unsupported by documentary evidence does not meet the clear and convincing standard and does not overcome the community property presumption).

"When reviewing an alleged property characterization error, we must determine whether the trial court's finding is supported by clear and convincing evidence and whether the characterization error, if established, was an abuse of discretion." *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007,

14

pet. denied). "While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed." *Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.).

<u>Reimbursement Claims</u>

A trial court has discretion to award a claim for reimbursement. *See Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982). When separate property is used to enhance the value of the community estate, including the reduction of community debt, the spouse whose separate property was used to enhance the value of the community estate has an equitable right of reimbursement. Tex. Fam. Code Ann. § 3.402; *Penick v. Penick*, 783 S.W.2d 194, 196 (Tex. 1988). The measure of reimbursement when one marital estate expends funds or assets to make capital improvements to the property of another marital estate is the enhancement in value to the receiving estate. *Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex. 1985); *Cook v. Cook*, 693 S.W.2d 785, 786 (Tex. App.—Fort Worth 1985, no writ). This enhancement is the difference between the fair market value before any improvements and the fair market value after the improvements made during the marriage, not the actual cost of improvements. *Sharp v. Stacy*, 535 S.W.2d 345, 351 (Tex. 1976); *Anderson*, 684 S.W.2d at 675. The party claiming reimbursement bears

the burden of establishing the net benefit to the payee estate. *Vallone*, 644 S.W.2d at 459; *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ).

Because of the equitable nature of a reimbursement claim, a trial court must look at all the facts and circumstances to determine what is just and fair. *Penick*, 783 S.W.2d at 197. Great latitude is accorded the trial court in applying equitable principles to value a reimbursement claim. *Id.* at 198. Such a claim is not merely a balancing of the ledgers between the marital estates; rather, the discretion to be exercised in evaluating a reimbursement claim is equally as broad as the discretion subsequently exercised by the trial court in making a just and right division of the community estate. *Id.* The burden of proving the claim rests with the claimant. *Vallone*, 644 S.W.2d at 459. The burden of securing a finding also rests with the claimant. *Id.* When a reimbursement award does not appear to be unjust, there is no abuse of discretion. *Bigelow v. Stephens*, 286 S.W.3d 619, 623 (Tex. App.— Beaumont 2009, no pet.).

The Trial Court's Award to David of a
"$37,680 Separate Property Interest Claim"
in the Marital Residence

In two issues, Kaitlyn challenges the trial court's finding awarding David a "$37,680.00 of separate property interest claim" on the marital residence. In her first

16

issue she argues that the trial court erred in making this separate property reimbursement because it was supported only by oral testimony that could not meet the "clear and convincing" standard. Kaitlyn argues that the trial court erred in characterizing David's reimbursement claim for repairs to the Foxtail house as separate property. In her second issue, she argues this award was in error because David failed to properly prove up his claim pursuant to section 3.402 of the Family Code and "[t]here was absolutely no indication of how any amount spent actually improved the value of the home."

It is undisputed that the evidence shows the marital residence was appraised at $210,000 in October 2014 and appraised at $240,000 in September 2017—an increase in value of $30,000. David made a reimbursement claim for the following expenses he alleged he incurred towards purchase, repair, and upgrading the Foxtail house:

| | | |
|---|---|---|
| Earnest money | | $1,000.00 |
| Down payment | | $8,400.00 |
| Fence | | $2,838.75 |
| Gift from David's parents | | $15,000.00 |
| Garage door repair | | $725.00 |
| Window replacement | | $685.00 |
| Other "minor" home repairs | | $259.00 |
| Proceeds from sale of David's prior house applied to improvements to Foxtail house | | $15,998.37 |
| | *Subtotal* | $44,906.12 |

David also sought $15,455 reimbursement for "[p]ayments towards the house (includes taxes/insurance) after separation[,]" and the total amount David sought in reimbursement was $60,361.12.

Of the amounts listed above, David and his mother both testified that $15,000 was an inheritance from David's grandparents, and as either a gift or inheritance, the $15,000 would have been David's separate property. *See* Tex. Fam. Code Ann. § 3.001(2). Another $9,400 represents payments made towards the purchase of the home from David's separate property bank account before marriage. *See id.* David also alleges that he owned a home prior to the marriage and when that house sold, he applied the proceeds to improvements of the Foxtail house. *See id.* § 3.402(a)(6) (a spouse may claim reimbursement for capital improvements to community property paid for by separate property).

We agree with Kaitlyn that the cost of improvements is not the correct measure for the reimbursement claim. *See* Tex. Fam. Code Ann. § 3.402(d); *Anderson*, 684 S.W.2d at 675. However, the trial court did not issue findings of fact and conclusions of law (and none were requested). Thus, there was no express finding the trial court meant for the $37,680 reimbursement award to represent the cost of the improvements claimed by David. Instead, we imply the trial court made all findings of fact necessary to support the judgment, and we will uphold those

18

findings if supported by sufficient evidence. *See Marchand*, 83 S.W.3d at 795. Kaitlyn argues that David failed to meet his burden of proof to establish by clear and convincing evidence that the alleged expenditures he made to the marital residence were from his separate property and that the improvements enhanced the value of the marital residence. On this record, we cannot say that the trial court erred in awarding David a reimbursement claim of $37,680 because the trial court could have believed the testimony of David and his mother that $15,000 was David's separate property gift from his family, and another $9,400 was from David's separate property prior to marriage, and the trial court could have concluded that David expended the amounts on the home. The trial court also could have believed from the testimony presented and the increased value to the property as reflected by the comparison of the 2014 and 2017 appraisals that the repairs David testified that he made from his separate property enhanced the value of the property in an amount equal to the amount awarded to David. *See, e.g.*, *Zamiatowski v. Zamiatowski*, No. 14-12-00478-CV, 2013 Tex. App. LEXIS 5272, at **5-6 (Tex. App.—Houston [14th Dist.] Apr. 30, 2013, no pet.) (mem. op.) (applying *Marchand*, the trial court could have concluded that the amount awarded as a reimbursement claim equaled the enhanced value of the property).

19

Kaitlyn argues the trial court erred in characterizing David's reimbursement claim for repairs as separate property, but nothing in the order states the basis for the trial court's confirmation of separate property to David "of $37,680.00 of separate property interest claim on the Marital Residence." Neither party requested findings of fact and conclusions of law or a clarification of the court's decree. Because the trial court's order awarding David $37,680 as a separate property interest claim is supported by clear and convincing evidence, we need not address Kaitlyn's issue regarding whether the trial court characterized the $37,680 as separate property or, if it did, whether such characterization was error. *See* Tex. R. App. P. 47.1; *Marchand*, 83 S.W.3d at 795; *Garcia*, 170 S.W.3d at 652 (if the implied findings are supported by the evidence, we must uphold the judgment on any theory of law applicable to the case). We overrule Kaitlyn's first and second issues.

## David's 401(k)

Kaitlyn's third issue argues that the trial court erred in finding that $29,584.30 in the 401(k) account through David's employer was David's separate property. According to Kaitlyn, the "only evidence" at trial rebutting the community property presumption for 401(k) contributions made during the marriage was David's own testimony, and such oral testimony is legally insufficient to overcome the community property presumption.

20

Kaitlyn testified at trial that, before the marriage, David had a balance in his 401(k) through his employer Dynamic Risk of $29,954:

> [Counsel for David]: . . . [W]as David working prior to being married -- not when you were engaged -- with the company he is still working at?
>
> [Kaitlyn]: Correct.
>
> [Counsel for David]: And you are aware that he had retirement investments at that time. Correct?
>
> [Kaitlyn]: Yes, ma'am.
>
> [Counsel for David]: And, as a matter of fact, you know the exact number, which is $29,954. Correct?
>
> [Kaitlyn]: Yes.

On appeal, David argues that this portion of Kaitlyn's testimony is an admission against interest and constitutes a "stipulation" to David's separate property interest in the 401(k). David testified at trial that, prior to the marriage, the balance of the Dynamic Risk account was $29,584.30.

To preserve error, a party's argument on appeal must comport with its argument in the trial court. *See Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639-40 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). In addition, a party's testimonial declarations that are contrary to his position are quasi-admissions that are "some evidence[]" but not conclusive upon the admitter. *Mendoza v. Fid. &*

21

*Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980). A judicial admission "results when a party makes a statement of fact which conclusively disproves a right of recovery or defense currently asserted." *Louviere v. Hearst Corp.*, 269 S.W.3d 750, 755 (Tex. App.—Beaumont 2008, no pet.).

> To be treated as a judicial admission, a party's statement must meet five requirements: (1) the statement relied on is made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the theory of recovery or defense asserted by the person making the statement; (3) the statement is deliberate, clear, and unequivocal; (4) giving conclusive effect to the statement will be consistent with the policy on which the judicial admission rule is based; and (5) the statement is not also destructive of the opposing party's theory of recovery.

*Id.* at 754-55. On this record, the trial court could have regarded Kaitlyn's testimony as a judicial admission about David's separate property interest in his Dynamic Risk 401(k). *See id.* At trial, Kaitlyn did not present any argument to the trial court indicating she disagreed with the amount David claimed was his separate property in his 401(k). Kaitlyn had the burden to preserve error in the trial court on this issue. *See* Tex. R. App. P. 33.1(a).

But even assuming Kaitlyn preserved error and did not make a judicial admission that prevents her appellate argument on this issue, the record includes testimony and documentary evidence that supports the trial court's finding. Respondent's Exhibit 3B was admitted into evidence without objection. It was titled

22

"Retirement Savings Plan Statement For the period October 1, 2014 - December 31, 2014" for "Phillip D Oliver" with a hire date of July 7, 2014. The document reflects a rollover contribution during this period in the amount of $27,275.37, which, after earnings and market value change, resulted in a rollover balance of $28,088.28. In addition, Kaitlyn and David's residential loan application was admitted as Respondent's Exhibit 14A, and it shows a vested interest in a retirement fund of $29,028. In consideration of all of the evidence that was before the trial court, we cannot say that the trial court abused its discretion in concluding that clear and convincing documentary evidence supported a finding that $29,584.30 in the Dynamic Risk 401(k) was acquired prior to the marriage and was David's separate property. *See* Tex. Fam. Code Ann. § 3.001(1); *Magness*, 241 S.W.3d at 912. We overrule Kaitlyn's third issue.

## Grounds for Divorce

Kaitlyn's fourth issue argues that the trial court erred in finding adultery only against her when David "admitted committing multiple acts of adultery." According to Kaitlyn, both she and David admitted to having sexual relations with others during the marriage and the trial court erred by decreeing only Kaitlyn's adultery.[1] Kaitlyn

---

[1] Kaitlyn does not argue that the trial court made a disproportionate distribution of the marital estate based on a finding that she committed adultery.

23

argues that the trial court could have decided not to reference the adultery as grounds for the divorce and that under the evidence before the trial court where both parties agree they have committed adultery during the marriage, "the effect of the trial court's recognizing only the adultery of Kaitlyn appears arbitrary, capricious, unfair and an abuse of discretion requiring reversal."

In its ruling from the bench, the trial court stated, "I am granting the divorce on the grounds of insupportability and, also, adultery by the wife." In the Final Decree of Divorce, the trial court ordered and decreed that Kaitlyn and David "are divorced and that the marriage between them is dissolved on the grounds of insupportability and adultery by Kaitlyn[.]"

The Family Code assigns the determination of grounds for divorce to the discretion of the trial court. *See Applewhite v. Applewhite*, No. 02-12-00445-CV, 2014 Tex. App. LEXIS 2306, at **3-4 (Tex. App.—Fort Worth Feb. 27, 2014, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. §§ 6.001, 6.003). A trial court "*may* grant a divorce in favor of one spouse if the other spouse has committed adultery." Tex. Fam. Code Ann. § 6.003 (emphasis added); *see also In re S.A.A.*, 279 S.W.3d 853, 856 (Tex. App.—Dallas 2009, no pet.) (Adultery means the "voluntary sexual intercourse of a married person with one not the spouse."). Adultery is not limited to actions committed before the parties separated. *In re C.A.S.*, 405 S.W.3d 373, 383

(Tex. App.—Dallas 2013, no pet.). Adultery can be shown by direct or circumstantial evidence. *Id.* A trial court is not required to grant a divorce on the basis of adultery where there is evidence of adultery. *See Applewhite*, 2014 Tex. App. LEXIS 2306, at **3-4 (where husband admitted to having had two affairs during the marriage, the trial court did not abuse its discretion in granting the wife a divorce on grounds other than adultery); *see also In re Hashimi*, No. 14-17-00488-CV, 2018 Tex. App. LEXIS 7071, at **16-17 (Tex. App.—Houston [14th Dist.] Aug. 30, 2018, no pet.) (mem. op.) ("[E]ven if sufficient evidence of adultery existed in this case, the trial court did not abuse its discretion by granting the divorce solely on the basis of insupportability.").

Although both David and Kaitlyn admitted they dated other people during the pendency of the divorce proceeding, Kaitlyn testified that she was unfaithful to David in 2016 and prior to the time the parties separated and decided to divorce in 2017. Based on the testimony from David and Kaitlyn at trial, the trial court could have believed that David's relationship with another woman did not begin until after his separation and after the parties decided to divorce, and thus the trial court could have concluded that David's adultery was not a ground for the dissolution of the marriage. *See Martel v. Martel*, No. 05-99-00177-CV, 2001 Tex. App. LEXIS 6025, at *7 (Tex. App.—Dallas Aug. 31, 2001, no pet.) (op. on reh'g) (a spouse cannot be

25

faulted for the breakup of a marriage based on adultery where that spouse's adultery did not occur until after the separation) (citing *Winkle v. Winkle*, 951 S.W.2d 80, 90-91 (Tex. App.—Corpus Christi 1997, writ denied)). On the record before us, we cannot say that the trial court abused its discretion in finding Kaitlyn's adultery and not finding David's adultery to be a ground for the dissolution of the marriage. We overrule Kaitlyn's fourth issue.

Kaitlyn's "Separate Property Interest Claim" in the House

Kaitlyn's fifth issue argues that she had a 13.6% separate property interest in the family house and the trial court erred in awarding that separate property interest to David. According to Kaitlyn, her 13.6% separate property interest in the family house was a gift from her mother.[2] Kaitlyn argues that the trial court correctly determined her separate property interest in the house, but it then awarded the house to David which violated article XVI of the Texas Constitution, and it is an unconstitutional taking.[3] Kaitlyn further argues that the trial court should have either

---

[2] Kaitlyn's appellate brief also argues that her mother gave her approximately 15% of the family house and sold the remaining 85% to David and Kaitlyn.

[3] Article XVI, section 50(a)(3) of the Texas Constitution provides in relevant part that

(a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for: (3) an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse

awarded Kaitlyn full possession and ownership of the house (with an appropriate offset to David) or it should have ordered a public sale of the property with Kaitlyn and David to divide the proceeds. David argues that the decretal language of the Final Decree of Divorce did not find that Kaitlyn had a separate property interest in the house, but rather it awarded an equitable reimbursement claim of $28,560 to Kaitlyn.

Central to Kaitlyn's argument is her contention that she received a separate property interest in the Foxtail house as a result of a gift from her family. She argues that the house was sold to Kaitlyn and David for a reduced purchase price and the reduction (approximately $60,000) was a gift to her as her separate property. In support of her contention that the reduction in the sales price of the home was a gift

---

in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding[.]

     Article XVI, section 15 of the Texas Constitution provides in relevant part that:

> All property, both real and personal, of a spouse owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse; and laws shall be passed more clearly defining the rights of the spouses, in relation to separate and community property[.]

Tex. Const. art. XVI, §§ 15, 50(a)(3).

to her from her mother and uncle, she testified, and her mother testified that the purchase price was reduced because Kaitlyn's family gave the reduction to Kaitlyn.

The appellate record provides evidence of only one conveyance of the Foxtail house—a sale to both David and Kaitlyn.[4] The evidence was uncontroverted that the marital residence was previously Kaitlyn's grandmother's home, that Kaitlyn and David entered into a real estate sales contract to purchase the home from the grandmother or her estate before Kaitlyn and David married, that the sales price for the home was agreed to be $160,000, that the home appraised for approximately $210,000, that Kaitlyn and David then closed on the home and received a deed to the home after they married, and that in 2017 the home appraised for $240,000. Kaitlyn and her mother testified that the reduced sales price was intended to be a gift to Kaitlyn only. David disagreed with that testimony. The appellate record includes no evidence of an actual *conveyance* of any separate interest in the home to Kaitlyn nor was there evidence of a *divestiture* of ownership in the home by Kaitlyn's mother, uncle, or grandmother prior to the closing and transfer of the home to Kaitlyn and David after they married. David and Kaitlyn purchased the home (financed in part by a joint mortgage). Based on the record before us, we cannot say

---

[4] Neither party introduced into evidence the deed to the Foxtail house, but both agreed that the deed was in both of their names.

that the trial court abused its discretion in failing to find that Kaitlyn held a separate property interest in the marital residence because the trial court could have reasonably concluded that Kaitlyn did not meet her burden of proof to establish by clear and convincing evidence that the reduced price was a gift to her (and not to her and David) from her family or that any portion of the Foxtail house was otherwise gifted to her separately, and she failed to overcome the community property presumption. *See* Tex. Fam. Code Ann. § 3.003; *In re Marriage of Royal*, 107 S.W.3d 846, 850-53 (Tex. App.—Amarillo 2003, no pet.); *see also Lopez v. Lopez*, 271 S.W.3d 780, 788 (Tex. App.—Waco 2008, no pet.) (a conveyance for consideration cannot be a gratuitous gift).

The trial court did not make a *finding* of a separate property *gift* to Kaitlyn. In announcing its ruling from the bench, the trial court stated "the wife has the following sum of interest as her separate property in the marital residence. That sum being $28,560." The Final Decree of Divorce states that "the following described property is confirmed as the separate property of Kaitlyn E. Oliver: . . . A finding of $28,560.00 of separate property interest claim on the Marital Residence . . . 1912 Foxtail Place[.]"

While we agree that a court cannot divest an owner of separate property, there is no divestiture of separate property when a party has not met the burden to

29

overcome the presumption of community property and the court characterizes the property at issue as community. *See Pearson v. Fillingim*, 332 S.W.3d 361, 364 (Tex. 2011) (where husband in a divorce proceeding failed to prove mineral deeds were received as gifts, he failed to overcome the community property presumption). We may affirm the divorce decree's order that Kaitlyn had a $28,560 claim on the Foxtail house by applying the section 3.402 statutory right of reimbursement to the value of the house. *See id.*; *see also* Tex. Fam. Code Ann. § 3.402. Therefore, the trial court did not err because it could have concluded that Kaitlyn failed to overcome the community property presumption regarding the Foxtail house and the award of $28,560 could have been based upon the trial court's conclusion that Kaitlyn is entitled to an equitable reimbursement claim. *See Pearson*, 332 S.W.3d at 364; *Garcia*, 170 S.W.3d at 652.

Additionally, we reject Kaitlyn's contention that the trial court awarded her separate property to David. The trial court did not find that the marital residence was Kaitlyn's separate property, nor did the trial court find it was David's separate property. The trial court could have reasonably concluded that the marital residence, which was acquired by deed after the marriage, and which is presumed to be part of the community estate, was part of the community estate. The trial court then awarded the marital residence to David, but imposed a separate property claim against the

30

residence in favor of David in the amount of $37,680 and in favor of Kaitlyn in the amount of $28,560.

There is evidence in the record showing that the claims in the divorce included a claim for reimbursement, and the court was authorized to enforce an owelty lien against the property. Generally, Article XVI, section 50 of the Texas Constitution protects individuals from being forced to sell a homestead, but the section has many exceptions. One of the exceptions is for "an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding[.]" Tex. Const. art. XVI, § 50(a)(3). That exception applies under the circumstances that were shown here. *See Heggen v. Pemelton*, 836 S.W.2d 145, 146 (Tex. 1992) (citing Tex. Const. art. XVI, § 50).

Appellant also contends that this case is controlled by *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). In *Eggemeyer*, the Supreme Court affirmed the court of appeals' reversal of the trial court's divorce decree. *Id.* at 142. The divorce decree had divested Homer Eggemeyer of his separate property undivided one-third interest in a farm that he had received as a gift and transferred title to Virginia Eggemeyer. *Id.* at 138. The trial court had also named Virginia

31

conservator of the couple's four minor children. *Id.* On appeal, Virginia argued that, notwithstanding article 4639a's prohibition against divesting a spouse of separate property, section 3.63 of the Family Code did authorize divestiture of Homer's separate realty and vesting it with her because the trial court can make such an order when it is "just and right."[5] *Id.* at 138-39. In affirming reversal of the trial court's decree, the Supreme Court explained that, while an interim administration of a spouse's property was authorized to assure the payment of child support, section 3.63 did not authorize divestiture of separate property. *Id.* at 139. The Court explained that the trial court's discretion to divide marital property does not extend to taking separate property from one spouse and giving it to the other, even though a parent's child support duty may be enforced against the parent as well as his separate property. *Id.* at 142.

---

[5] Former Article 4638 provided that:

> The court pronouncing a decree of divorce shall also decree and order a division of the estate of the parties in such a way as the court shall deem just and right, having due regard to the rights of each party and their children, if any. Nothing herein shall be construed to compel either party to divest himself or herself of the title to real estate.

Former section 3.63 provided that:

> In a decree of divorce or annulment the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.

*See Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 139 n.1 & 2 (Tex. 1977).

We find *Eggemeyer* inapposite to the present case. Not only does this case involve no child support obligations, but as we have explained herein, the trial court did not make a finding that the marital residence was Kaitlyn's separate property and it did not "divest" her of separate property ownership. Therefore, there is no constitutional infirmity. We overrule Kaitlyn's fifth issue.

Having overruled all Appellant's issues, we affirm the trial court's divorce decree.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on October 31, 2019
Opinion Delivered March 12, 2020

Before McKeithen, C.J., Horton and Johnson, JJ.